FILED

2025 AUG 20 PM 12: 26

CLERK, US DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY _____ *CR*
DEPUTY

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND MONETARY RELIEF**

**ALISA GOLZ**, Individually and as Next Friend of her minor children,
**PARKER GOLZ** and
**GREYSON MCCALLUM**,
Plaintiffs

v.

**TEXAS DEPARTMENT OF FAMILY AND PROTECTIVE SERVICES** (DFPS);
**MAERETHA WILBURN**, in her individual and official capacities;
**CHELSEA CAMPOS**, in her individual and official capacities;
**JAMIE WALKER**, in her individual and official capacities;
**BRIDGET O'SHAUGHNESSY**, in her individual and official capacities;
**QUEST DIAGNOSTICS INC.**;
**OMEGA LABORATORIES, INC.**;
**I3SCREEN LLC**;
**TEXAS DRUG & ALCOHOL TESTING SERVICES, INC.**;
Defendants

**Case No. 1:25-CV-01316**
**Honorable Judge Alan D. Albright presiding**
**42 U.S.C. §§ 1983, 1985; Title II ADA,**
**42 U.S.C. § 12132; Evidence Fabrication; Conspiracy; State Law**

## I. INTRODUCTION

Plaintiffs Alisa Golz and her minor children Parker Golz and Greyson McCallum, together, bring this action to redress a coordinated course of unconstitutional and unlawful conduct by Texas DFPS employees and affiliated laboratories.

This suit seeks declaratory, injunctive, and monetary relief for violations of the Fourth, Fifth, First, and Fourteenth Amendments, Title II of the ADA, 42 U.S.C. §§ 1983 and 1985, and Texas law.

## II. JURISDICTION AND VENUE

Jurisdiction is proper under 28 U.S.C. §§ 1331 and 1343(a)(3)-(4) for federal civil rights violations. Supplemental jurisdiction exists under 28 U.S.C. § 1367 for state-law claims.
Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because Travis County, Texas, is the primary location of events.

## III. PARTIES

Plaintiffs:

**Alisa Golz**, resident of Travis County, Texas
 and biological mother of Parker Golz and Greyson McCallum.
**Parker Golz** born 09/08/2013, appearing through Next Friend Alisa Golz.
**Greyson McCallum** born 11/06/2024, appearing through Next Friend Alisa Golz as well.

Defendants:

**Texas DFPS** and individual employees:
**Maeretha Wilburn**,
**Chelsea Campos**,
**Jamie Walker**,
**Bridget O'Shaughnessy**.
**Quest Diagnostics Inc., Omega Laboratories Inc.,**
**i3Screen LLC, Texas Drug & Alcohol Testing Services Inc.**

## IV. FACTUAL ALLEGATIONS

### A. Premature Drug Exposure Allegations at Birth

On November 6, 2024, Plaintiff Alisa Golz gave birth to her youngest child, Greyson McCallum at St. David's North Austin Medical Center in Travis County, Texas. Within 24 hours of Greyson's birth, the Texas Department of Family and Protective Services ("DFPS") initiated an investigation alleging that Greyson had been exposed in utero to methamphetamine and fentanyl.

Critically, the meconium drug screen — the scientifically accepted method of testing for prenatal drug exposure — remained pending at the time DFPS initiated its investigation. That screen was not completed until November 25, 2024, nearly three weeks later. Plaintiff was never provided with a copy of that report, nor was she ever notified of its results before DFPS proceeded with intrusive enforcement actions.

DFPS repeatedly alleged that Plaintiff had admitted to fentanyl use, yet knowingly omitted the incontrovertible medical fact that fentanyl had been administered to Plaintiff by medical personnel during labor.

Hospital staff and representatives consistently informed Plaintiff that the hospital had no safety or medical concerns regarding Greyson. Staff repeatedly confirmed that Greyson was medically stable and that there were no issues requiring intervention.

Hospital records from the birth hospitalization, including Apgar scores and nursing assessments, confirm that Greyson exhibited no signs of drug withdrawal or neonatal abstinence syndrome (NAS) at birth or during his stay. Both Apgar scores placed Greyson in the 90th percentile, reflecting normal, healthy newborn functioning. These medical facts directly refute DFPS's theory of illicit drug exposure and harm.

In addition, DFPS's own internal investigative documentation reflected that same conclusion. In official case notes, a DFPS investigator expressly recorded that there were "no current safety or

medical concerns for Greyson." This acknowledgment directly aligned with hospital assessments and further confirmed that Greyson was never at risk.

**B. Fabrication of Evidence and Coerced Safety Plan at the Hospital**

On November 8, 2024, while Plaintiff was still hospitalized, just two days postpartum and physically recovering from preeclampsia, DFPS Investigator Karen Golden approached her at her bedside.

Golden informed Plaintiff that Greyson's meconium drug screen had already been completed and falsely claimed that it showed the presence of methamphetamine and fentanyl.

This representation was a material falsehood. In truth, the meconium screen had not yet been completed at that time, and existing medical records documented Greyson as a healthy newborn with no signs of withdrawal, Neonatal Abstinence Syndrome (NAS), or medical distress.

By presenting false test results as fact, Golden sought to deliberately mislead and coerce Plaintiff into signing the first DFPS-imposed "Safety Plan." Golden conditioned closure of the DFPS investigation on Plaintiff's agreement to submit to a single drug test within two weeks, explicitly promising that a negative result would end the case.

Exhausted, intimidated, and still recovering from childbirth complications, Plaintiff — fearing for her newborn's immediate safety — signed the Safety Plan in an effort to protect her child and secure closure of the case.

This incident demonstrates DFPS's bad faith and unlawful conduct, including:
a. Fabrication and misrepresentation of evidence by falsely asserting meconium test results confirmed illicit drug exposure;
b. Suppression and disregard of exculpatory medical evidence, including hospital records and medical staff assessments affirming Greyson's health and stability at birth; and
c. Coercion through fraudulent inducement, exploiting Plaintiff's medical vulnerability to secure an involuntary agreement under duress.

Golden's actions — deliberately fabricating evidence, concealing exonerating medical facts, and conditioning parental rights on a coerced signature — deprived Plaintiff of her constitutional right to due process under the Fourteenth Amendment, and violated both Texas Family Code requirements of truthful, evidence-based reporting and DFPS's own internal policies.

This fraudulent inducement did not merely constitute procedural error; it was intentional, malicious conduct designed to create a false record of parental unfitness where none existed, laying the foundation for the unlawful removals and separations that followed

**C. Warrantless Search, Coercion, and Police Threats**

On November 11, 2024, just days after Plaintiff returned home from the hospital and signed the initial Safety Plan, DFPS Investigator Chelsea Campos arrived at Plaintiff's residence without prior notice, a warrant, or any court order authorizing entry. Campos proceeded to enter Plaintiff's home and conduct an intrusive search of private adult-only areas, including opening locked drawers and taking photographs—all without Plaintiff's consent.

At no time did Campos provide Plaintiff with any advisement of her legal rights or explanation of the basis for the search, as required by Texas Family Code § 261.302, which mandates notice of investigative rights during CPS interventions.

After the unlawful entry and search, Campos escalated the intimidation by summoning uniformed police officers with flashing lights as a show of force. These officers arrived on the scene despite no evidence of exigent circumstances or imminent danger, further compounding Plaintiff's distress.

Campos leveraged the presence of law enforcement to coerce Plaintiff into signing a second Safety Plan under threat of immediate child removal and the possibility of permanent state intervention. Plaintiff, still physically recovering from childbirth and facing intimidation from both DFPS and police, was left with no realistic choice but to comply.

Campos's actions—warrantless entry, failure to advise of rights, and use of police for intimidation and coercion—constituted clear violations of Plaintiff's Fourth Amendment protections against unreasonable searches and seizures, as well as Texas statutory law and

established agency policy. These acts further intensified Plaintiff's trauma and laid the foundation for ongoing constitutional and statutory violations.

### D. Arbitrary Reversal of DFPS Findings Without Evidence

On December 30, 2024, after completing its internal investigation, DFPS formally issued a written Notice of Finding concluding that Plaintiff's eldest child, Parker Golz, was not neglected, and fully "Ruled Out" the allegations against Plaintiff.

This determination aligned with the evidence available at the time, including DFPS's own documentation noting the home was safe, stable, and that no risk of harm existed.

However, on April 8, 2025, without the presentation of any new credible evidence, without a documented change in circumstances, and without affording Plaintiff notice or a meaningful opportunity to contest new allegations, DFPS unilaterally reversed its finding and reclassified the matter from "Ruled Out" to "Reason to Believe" neglect had occurred.

This arbitrary reversal directly contravenes established Texas jurisprudence, including In re B.L.D., 113 S.W.3d 340 (Tex. 2003), which requires that adverse findings impacting parental rights be supported by substantial new evidence and conducted with due process protections.

To further obscure and mislead, DFPS's subsequent Permanency Report reiterated the adverse "Reason to Believe" finding but conspicuously omitted any reference to the prior "Ruled Out" determination. This omission deprived Plaintiff of fair notice of the prior favorable finding, and impaired her statutory and constitutional ability to challenge the reversal.

DFPS's conduct in arbitrarily reversing and concealing the original finding not only violated the principles of fundamental fairness and due process under the Fourteenth Amendment, but also:

Texas Family Code § 261.001 et seq.: requiring child abuse/neglect findings to be based upon a preponderance of credible evidence.

Texas Family Code § 261.307(a): requiring written notice of investigative results to be provided to the parent, including information on how to challenge or appeal adverse findings.

Texas Administrative Code, 40 TAC § 700.512: mandating accuracy, transparency, and the maintenance of complete investigative findings in the record.

The deliberate omission of the prior "Ruled Out" status and DFPS's false portrayal of Plaintiff as neglectful deprived her of meaningful notice, deprived her of the ability to contest fabricated claims, and materially prejudiced her standing before the family court.

This reversal was not the result of oversight or error, but was a malicious and retaliatory act designed to justify continued DFPS involvement and custody interference, despite the absence of lawful evidence or findings.

**E. Improper Use of Unsubstantiated Prior Allegations**

In its reports and filings, DFPS deliberately included references to two prior investigations involving Plaintiff that had been formally closed as unsubstantiated.

DFPS nevertheless cited these prior incidents in its narrative to construct a false pattern of neglectful behavior, despite the fact that neither incident had resulted in a finding of abuse, neglect, or risk of harm.

Plaintiff was never adjudicated as neglectful or abusive in any prior matter. DFPS's continued use of closed and unsubstantiated reports to cast Plaintiff in a negative light was unauthorized, misleading, and contrary to DFPS's own policies, which prohibit reliance on unsubstantiated allegations as evidence of parental unfitness.

By relying on, and deliberately highlighting, unproven allegations, DFPS created the appearance of a history of parental misconduct where none existed. This practice is a recognized constitutional violation, as reliance on unsubstantiated prior reports to justify state intrusion infringes upon a parent's Fourteenth Amendment right to family integrity and due process.

DFPS's inclusion of these allegations was intentionally misleading and prejudicial, designed to bias both internal decisionmakers and judicial authorities against Plaintiff, thereby stripping her of a fair and impartial evaluation.

**F. Inconsistent and Selective Targeting of Plaintiff's Children**

On March 17, 2025, DFPS Investigator Kass initiated an investigation based upon a false and retaliatory report submitted by Greyson's disgruntled father. During the course of his investigation, Investigator Kass personally observed Greyson and specifically documented no signs of neglect, abuse, or risk of harm.

Notwithstanding his own direct observations and documented conclusions, Investigator Kass nevertheless issued a formal finding of "Reason to Believe" neglect and/or abuse had occurred. This finding was wholly inconsistent with the evidence gathered during the investigation and is indicative of a fabricated or pretextual outcome, unsupported by any credible facts.

More troubling still, Investigator Kass's targeting of Plaintiff's children was inconsistent, shifting, and arbitrary. Although the investigation originated as an inquiry concerning Greyson alone, subsequent DFPS filings inexplicably added Parker into the allegations while completely omitting Greyson from the case — despite Kass's investigation having been premised solely on Greyson's circumstances.

This inconsistent and selective enforcement evidenced bad faith and retaliatory targeting, designed to maximize disruption to Plaintiff's family rather than to neutrally determine child safety. The arbitrary addition of one child while abandoning another from the record creates a distorted narrative and undermines the legitimacy of DFPS's findings.

In addition, DFPS failed to comply with the procedural mandates of Texas Family Code § 261.307(a), which requires written service of investigation results upon the parent or guardian. Plaintiff was never served with notice of DFPS's adverse findings, thereby depriving her of any meaningful opportunity to contest, appeal, or administratively challenge the fabricated result.

This failure of basic notice deprived Plaintiff of her constitutional due process rights under the Fourteenth Amendment, while also violating clear statutory protections designed to ensure fairness and accountability in child protective investigations.


**G. Fabricated Use of Invalid Oral Swab at April 1, 2025 Hearing**

On March 25, 2025, Plaintiff submitted an oral fluid specimen for drug testing. The laboratory report flagged the sample as "Invalid" due to abnormal total protein levels — a result that did not constitute a positive finding under accepted toxicology standards.

Despite this, DFPS caseworker Maeretha Wilburn deliberately misrepresented the laboratory's "Invalid" result as though it were a confirmed Positive test. On April 1, 2025, Wilburn presented this mischaracterized result at an ex parte emergency removal hearing, where she expressly requested that the court impose a so-called "court-ordered safety plan."

Wilburn's characterization was a knowing fabrication of material evidence, maliciously designed to mislead the court and secure judicial authorization for the unwarranted removal of Plaintiff's children.

By statute and agency rule, Safety Plans are voluntary agreements and cannot be compelled without parental consent or formal judicial adjudication. See DFPS Policy 2400; Texas Family Code § 262.201. Safety Plans are intended as cooperative measures — they do not carry the force of a court order unless properly incorporated into judicial findings after notice and hearing.

Nevertheless, Wilburn fraudulently represented to the Plaintiff that such a plan could be judicially compelled, while simultaneously withholding from Plaintiff all notice that the April 1, 2025 hearing was taking place. Plaintiff was given no opportunity to be present, no opportunity to challenge the admissibility of an "Invalid" test, and no chance to be heard regarding the seizure of her children.

At the time Wilburn appeared in court with these false representations, both Parker and Greyson had already been physically removed from Plaintiff's care, taken without warrant,

judicial order, or proper legal cause. Plaintiff only learned of these proceedings retroactively through fragmented agency communications.

On April 2, 2025, still reeling from the secret removal and under the direct duress of threatened permanent loss of her children, Plaintiff was coerced into signing yet another DFPS Safety Plan, this one concerning Parker only. No meaningful choice was given; Plaintiff's "agreement" was extracted solely under threat, and both children remained barred from her custody for more than four months.

These events constitute not merely administrative error but malicious and willful violations of law and constitutional protections, including:

Fabrication of evidence by misrepresenting a flagged "Invalid" test as "Positive";

Fraud on the court by securing judicial action through knowingly false statements;

Secret hearings conducted without notice to Plaintiff, violating core due process under the Fourteenth Amendment;

Unconstitutional seizure of children without lawful court order or emergency finding, in direct violation of Texas Family Code § 262.201 and the Fourth Amendment;

Coercion and forced waiver of rights, where Plaintiff was made to sign a "Safety Plan" under threats of permanent removal, despite the plan's voluntary nature under governing law.

Wilburn's conduct was not accidental or negligent, but deliberate, retaliatory, and malicious. By fabricating evidence, manipulating the court, and coercing compliance through fear and secrecy, DFPS deprived Plaintiff and her children of their most basic rights to family integrity, due process, and freedom from unlawful state interference.

llegal Ex Parte Removal and Coercion
On May 29, 2025, Defendant Maeretha Wilburn, acting under color of state law and her official authority, pursued and obtained an ex parte Temporary Managing Conservatorship (TMC) order

authorizing removal of Plaintiff's son, Parker, from Plaintiff's custody. This removal was secured without notice, without hearing, and without any factual showing of emergency, danger, or ongoing risk to the child.

At the time this order was obtained, Parker was not residing with Plaintiff. Since April 1, 2025, Parker had been placed with and residing under the care of Melanie Aguilar, an approved alternative caregiver. Plaintiff's mother—already vetted and approved as a safe kinship placement by DFPS—was scheduled to fly in and arrive within two days of this ex parte removal.

Despite the availability of these two approved family placements, Defendants deliberately misrepresented in their reports that Plaintiff allegedly had "no suitable relatives" for kinship care, in order to create a pretext for seeking conservatorship.

The true basis for Wilburn's pursuit of this ex parte removal was not an emergency or a danger to Parker, but Plaintiff's refusal to sign a sixth Safety Plan. By this time, Plaintiff had discovered that Safety Plans were voluntary, not mandatory, and that her repeated coerced signatures had been wrongfully exploited against her.

Facing Plaintiff's refusal to acquiesce, Wilburn turned instead to the courts and maliciously sought an ex parte order to strip Plaintiff of her rights and to block imminent placement with Plaintiff's mother. The motion was timed specifically to preempt kinship placement and to punish Plaintiff for asserting her rights against ongoing coercion.

This action was illegal and constitutionally infirm for multiple reasons:

There was no evidence of imminent harm or continuing danger, a prerequisite for TMC orders under Texas Family Code § 262.201;

The removal was obtained without notice or hearing, violating Plaintiff's right to due process under the Fourteenth Amendment;

The order relied on false statements regarding kinship placement availability, constituting fraud on the court;

The removal served as retaliation for Plaintiff's protected right to refuse coercive agreements.

By using the machinery of the court to retaliate against Plaintiff for declining to sign an unlawful Safety Plan, Defendants willfully violated Plaintiff's constitutional rights to family integrity, due process, and freedom from compelled agreements. The ex parte TMC order was not an act of child protection, but an act of retaliation and abuse of state power calculated to punish Plaintiff and prevent her mother from resuming care.

### H. Comprehensive Failures and Fabrication in Drug Testing Evidence

The drug testing evidence upon which DFPS relied was not merely flawed; it was scientifically unsound, procedurally contaminated, and constitutionally invalid. Taken together, the record reflects an intentional pattern of fabrication, backdating, chain-of-custody breaches, and disregard of exculpatory information that deprived Plaintiff of fundamental fairness and due process.

The key failures and irregularities include:

Chain of Custody and Identity Failures

Donor SSN and ID numbers varied across forms tied to Plaintiff's name.

Custody forms inconsistently described the same specimen as both "single" and "split."

Collection/Reporting dates did not align, and routing records showed unexplained transfers between Austin, Houston, and Brownsville labs without authorization.

Conflicting Laboratory and MRO Certifications

At least two different MROs (Dr. Steven Paschall and Dr. Janelle Jaworski) certified the same specimen, in violation of federal drug testing protocol (49 C.F.R. Part 40).

Neither MRO ever contacted Plaintiff to verify her lawful Desoxyn prescription despite amphetamine/methamphetamine positives requiring mandatory verification.

Almost every result was recorded as "positive until further verification of prescriptions," yet no verification was ever performed.

Biological and Pharmacological Impossibility

One urine test reported methamphetamine levels exceeding 20,000 ng/mL — levels lethal and incompatible with life absent hospitalization, a physiological impossibility for Plaintiff given her clinical stability.

Hair testing reported methamphetamine levels as high as 6,265 and amphetamine 1,125 within a 0.5-inch segment — values grossly inconsistent with medical reality and absent any signs of toxicity.

Disparities emerged between urine, oral fluid, and hair: some reporting methamphetamine without amphetamine, others reporting both, a pharmacological contradiction.

Invalid Specimens and Testing Protocol Violations

The oral fluid specimen showed protein levels <20 mg/dL, which according to forensic guidelines should have automatically invalidated the test and required recollection. It was nevertheless reported as evidence of drug use.

Reports alternated between DOT and Non-DOT classifications, creating ambiguous and conflicting legal frameworks.

Employer IDs alternated between DFPS Region 6 and DFPS Region 7, raising questions of who properly ordered the tests.

Collection site code TX996 inconsistently appeared in both Austin and Brownsville documentation, suggesting misrouting or fabricated entries.

Different lab account numbers were used across reports for the same agency, reflecting administrative manipulation.

Scientific Reliability Failures Under Daubert

Reports frequently omitted or failed to specify units of measure (ng/mL vs. ng/mg).

No raw data, calibration logs, or quality control records were ever provided.

Hair samples were cut only 0.5 inches long, far shorter than the standard 1.5-inch segment required for reliable 90-day detection.

Date-attribution practices segmented hair outside scientifically validated methods, creating misleading results.

No consideration was given to Plaintiff's medical history or documented weekly pretrial drug testing during pregnancy, all of which yielded negative results.

Backdating and Retroactive Fabrication

Multiple reports appear to have been backdated or certified after critical hearings, then entered retroactively into the record as if they existed contemporaneously.

DFPS affidavits repeatedly represented results as "confirmed" prior to dates when laboratories even finalized testing, constituting fraud on the court.

Despite these systemic flaws, DFPS used the compromised test results to:

Coerce Plaintiff into signing involuntary Safety Plans;

Secure emergency removal orders through ex parte misrepresentation;

Block kinship placement with approved relatives; and

Prolong family separation in violation of constitutional rights.

The cumulative effect of these failures demonstrates that the toxicology evidence was:

Unreliable and inadmissible under the Daubert standard for scientific evidence (Daubert v. Merrell Dow, 509 U.S. 579 (1993));

Fabricated and fraudulent, deliberately altering timelines and specimen data contrary to Mooney v. Holohan, 294 U.S. 103 (1935) (use of false evidence violates due process);

Statutorily insufficient under Texas Family Code § 262.201, which requires substantial credible evidence before emergency removal of a child; and

Constitutionally infirm under the Fourth and Fourteenth Amendments, as specimens were collected and used without valid consent, court order, or reliable forensic basis.

By knowingly relying on scientifically impossible values, invalid specimens, mismatched identity data, and backdated reports, DFPS and its laboratory partners engaged in a deliberate pattern of evidence fabrication that deprived Plaintiff of her constitutional due process rights, parental liberty interests, and protections against unlawful search and seizure.

### I. Unlawful Custody Interference and Daycare Seizure

On May 13, 2025, DFPS caseworker Maeretha Wilburn contacted Greyson's daycare and falsely instructed staff that Plaintiff, Ms. Alisa Golz, was "not authorized to pick up Greyson." Wilburn directed daycare personnel that, should Plaintiff attempt to exercise her parental rights, they were to contact the CPS abuse hotline to prevent her from accessing her child.

The justification offered for this directive was a so-called "court-ordered safety plan." This claim was patently false. At the time of Wilburn's directive, no such court order existed. Any safety plan that had previously been discussed was strictly voluntary in nature and had not been

incorporated into any judicial order. CPS itself had already confirmed to Plaintiff that her parental rights were not subject to any formal restriction.

By misrepresenting the binding authority of a voluntary safety plan and treating it as an enforceable judicial decree, DFPS acted outside its lawful authority and in direct violation of established policy and law, including:

DFPS Policy 2400, which explicitly provides that safety plans are voluntary and cannot be enforced as court orders; and

Texas Family Code § 262.116(a), which prohibits DFPS from restricting or interfering with the possession of a child absent an emergency determination or valid court order.

Defendant Wilburn's actions constituted an unlawful seizure and an unauthorized deprivation of custodial rights. Plaintiff was effectively barred from retrieving her child — not by order of a court of law, but by the false representations of a state actor abusing her authority.

This unlawful restriction was not a single-day event. DFPS sustained this blockade of Plaintiff's access to her child for months thereafter, continuing to misrepresent the legal status of Plaintiff's rights and compounding the harm.

By interfering with Plaintiff's custodial rights without judicial authorization, DFPS not only violated the Fourteenth Amendment right to family integrity and due process, but also denied Greyson his fundamental right to familial association.

This deliberate misuse of authority caused severe emotional and psychological harm to both Plaintiff and Greyson, as it deprived them of their lawful parent-child relationship absent due process of law.

Denial of Sibling Association
For a continuous period exceeding four months, DFPS categorically prohibited all contact between siblings Parker and Greyson. This absolute prohibition was imposed notwithstanding

the fact that the right to maintain sibling association has been repeatedly recognized as a fundamental liberty interest inherent in the Due Process Clause of the Fourteenth Amendment.

At no point did DFPS identify or document any individualized risk, safety concern, or lawful justification that could warrant such an extreme intrusion into the sibling bond. No emergency finding, judicial order, or case-specific evidence was ever offered to explain or support the denial of sibling visitation.

By enforcing this blanket prohibition, DFPS manufactured separation and isolation between two young brothers whose relationship was central to their emotional well-being and stability. The deprivation was wholly arbitrary, punitive, and unsupported by evidence, serving no legitimate child-protective interest.

This conduct violated not only Plaintiff's fundamental liberty interest in family integrity but also Parker's and Greyson's independent Fourteenth Amendment rights to continuity of family and sibling association. The deliberate severance of sibling bonds for months at a time constitutes an extreme and unconstitutional form of state interference with core family relationships.

DFPS further forbade Parker from having unsupervised visits with his maternal grandmother, even though she had been formally approved by DFPS as a safe placement provider. This abrupt revocation of Parker's familial access occurred without notice, process, or cause, thereby violating Parker's rights to familial association, liberty of movement, and stability in care.

In addition, Parker was denied the opportunity to engage in private and unsupervised communication with his mother, Plaintiff Alisa Golz, despite recurring requests and the absence of any evidence of harm or risk. This censorship of all confidential communications unconstitutionally infringed upon both Plaintiff's and Parker's First Amendment rights to free speech, expression, and association.

These restrictions were not narrowly tailored, supported by evidence, or justified by any compelling governmental interest. Instead, they were arbitrary, punitive measures designed to

isolate Plaintiff and her children from one another and to erode family bonds without due process of law.

The State's categorical denial of sibling visitation, grandparent access, and private communication with Plaintiff caused severe psychological harm to both children, undermined the children's emotional security, and inflicted lasting trauma through forced separation from their family network of love and support.

These actions constitute unconstitutional and intrusive state interference with protected family rights, in direct violation of the First and Fourteenth Amendments.

**J. ADA Violations and Retaliation**

Plaintiff disclosed her ADHD diagnosis and lawful prescription of Desoxyn multiple times and requested reasonable accommodations such as extended deadlines, written instructions, and neutral observers.

DFPS systematically denied Plaintiff's repeated requests for reasonable accommodations related to her documented disabilities. Rather than honoring its obligations under federal disability rights statutes, DFPS instead mischaracterized Plaintiff's disability-related symptoms as evidence of parental "noncompliance."

Specifically, DFPS officials deliberately misattributed Plaintiff's well-documented ADHD symptoms — including rapid speech and difficulty sitting still — as signs of illicit drug use, thereby pathologizing her disability and weaponizing it against her in the child welfare context. This conduct not only ignored medical evidence but also directly contravened the protections afforded under the Americans with Disabilities Act (ADA) and the Rehabilitation Act, which prohibit precisely this type of discriminatory stereotyping.

When Plaintiff challenged irregularities in DFPS's drug testing procedures and raised objections to this discriminatory treatment, DFPS officials retaliated by escalating their involvement against her, amplifying unfounded concerns, and using her disability symptoms as pretextual justification for adverse action.

This pattern of conduct reflects both discrimination on the basis of disability and retaliation for protected activity, denying Plaintiff equal treatment, accommodation, and procedural fairness. DFPS's conduct further deprived Plaintiff of her constitutional rights to due process, equal protection, and meaningful participation in proceedings concerning her family.

Moreover, DFPS Program Director Jamie Walker demeaned Plaintiff's medication as "legal meth" and threatened removal for appropriate treatment, violating Title II of the ADA and implementing a hostile and discriminatory environment.

### K. Deliberate Disregard of Child Testimony, Fabrication of Harm, and Suppression of Exculpatory Evaluations

Throughout DFPS's involvement, Plaintiff's eldest son, Parker, repeatedly expressed to agency personnel, his Court Appointed Special Advocate (CASA), and his court-appointed guardian ad litem that he was safe, loved, and wanted to return home to his mother. Parker's consistent, heartfelt assurances were deliberately ignored or erased from DFPS's narrative.

DFPS's own Family and Safety Needs Assessments prior to removal explicitly documented Parker as thriving in Plaintiff's care, recording safe home conditions, adequate food, health care, and emotional stability within the family home. Nevertheless, following removal, DFPS reports abruptly reversed course, falsely portraying Parker as "not doing well" and manufacturing claims that he required therapy to address alleged trauma stemming from Plaintiff's care.

Defendant Maeretha Wilburn compounded these fabrications by directly making injurious statements to Parker, falsely telling him that Plaintiff was "not a safe person to live with or be around." These stigmatizing assertions were made without any judicial finding or supporting evidence, and in direct conflict with DFPS's own earlier safety assessments. Such conduct constituted emotional manipulation that intentionally sought to alienate Parker from his mother, in violation of Plaintiff's fundamental liberty interest in family integrity under the Fourteenth Amendment and Parker's First Amendment right of familial association.

**L. Fabrication of False Statements to Psychological Evaluator**

In the course of DFPS proceedings, Defendant Maeretha Wilburn deliberately misrepresented Plaintiff's history and made knowingly false statements to the psychologist assigned to conduct Plaintiff's mental health and parenting evaluation.

Specifically, Wilburn falsely told the psychologist that Plaintiff had personally admitted to using "cocaine, marijuana, LSD, mushrooms, alcohol, and methamphetamine all before the age of 16." This statement was patently false. In reality, by the age of 16 Plaintiff had only consumed alcohol on a handful of occasions and experimented with marijuana a few times. Plaintiff never engaged in daily or habitual use of any controlled substances during adolescence, nor had she ever admitted such conduct to Wilburn.

Wilburn further fabricated a far more damaging accusation: that Plaintiff had admitted to smoking methamphetamine every day during her pregnancy with Greyson. This was categorically false.

In fact, throughout the duration of her pregnancy, Plaintiff was subject to weekly drug testing in connection with a separate pretrial monitoring program, and every test she submitted returned negative for controlled substances. Plaintiff explicitly informed Wilburn of this fact and told Wilburn she could obtain those drug test reports. Wilburn acknowledged this statement by Plaintiff but nevertheless chose to disregard it.

By falsely attributing to Plaintiff confessions she never made, and by deliberately ignoring exculpatory evidence of consistent negative drug screens, Wilburn engaged in:

Fabrication of evidence in violation of the Fourteenth Amendment's Due Process Clause (Mooney v. Holohan, 294 U.S. 103 (1935));

Suppression of exculpatory evidence contrary to DFPS policy and the legal requirement under Brady v. Maryland, 373 U.S. 83 (1963), that state actors disclose exculpatory material;

Defamation per se under Texas law, by imputing drug abuse and criminal conduct to Plaintiff, thereby harming her reputation and prejudicing her ability to obtain fair evaluation; and

Fraud on the court, by knowingly providing false information to an official court-appointed evaluator tasked with producing evidence used in custody proceedings.

These falsehoods were not the result of negligence, mistake, or miscommunication. They represented deliberate, malicious efforts by Wilburn to poison the evaluation process, discredit Plaintiff as a mother, and manipulate the outcome of the DFPS case by manufacturing a false narrative of severe and ongoing drug abuse.

Such conduct constitutes state-sponsored evidence fabrication and defamation, and it deprived Plaintiff of her fundamental liberty interests in family integrity and due process, violating both federal law and Texas statutory protections.

**M. Independent documentation from neutral evaluators overwhelmingly contradicted DFPS's narrative:**
CASA reports consistently affirmed that Plaintiff maintained a safe, stable, and loving home environment.

DFPS staff prior to removal documented the home as adequately supervised, orderly, equipped with stable food, hygiene, and developmentally appropriate care.

Psychological evaluation dated June 3, 2025 confirmed no evidence of substance use, no mental health barriers to parenting, and effective, stable ADHD management.

Outreach, Screening, Assessment, and Referral (OSAR) evaluations—three separate professional substance-use screenings—each conclusively cleared Plaintiff of substance use disorder. No diagnosis or recommendation for treatment was ever made.

Despite OSAR's consistent findings, Plaintiff voluntarily engaged in additional counseling sessions to proactively demonstrate dedication to her children's well-being, beyond what was required. These sessions underscored both her compliance and proactive, good-faith parenting.

Taken together, these unbiased and scientifically recognized third-party evaluations uniformly and reliably demonstrate Plaintiff's parental fitness and absence of substance abuse.

Rather than acknowledge this objectively favorable record, DFPS instead relied on fabricated evidence and defamatory mischaracterizations, suppressing exculpatory findings and perpetuating a knowingly false narrative of parental unfitness.

By disregarding Parker's testimony, manipulating his perception of his mother, excluding CASA and evaluator findings, and substituting fabricated claims, DFPS violated:

Fourteenth Amendment Due Process rights to fair consideration on the basis of credible evidence;

First and Fourteenth Amendment rights of familial association, by deliberately interfering with the parent-child bond through false statements and alienation;

Texas Family Code §§ 261.101, 263.307, requiring decisions to be grounded in credible evidence and in the child's best interests; and

DFPS's own internal policies require reliance on substantiated, verifiable findings rather than unsupported allegations.

DFPS's conduct was not simply negligent but malicious, intentional, and retaliatory, representing state action that deliberately disregarded exculpatory evidence while fabricating a record of harm. These constitutional violations inflicted profound psychological trauma on Parker, damaged his trust in his parent, and deprived Plaintiff of her fundamental rights as a fit and loving mother.

**N. Arbitrary and Unsupported Elevation of Risk Assessment**
DFPS initially classified Plaintiff's family as "Safe/Low Risk" based on its own Family Safety Needs Assessments and investigative documentation, which consistently observed no signs of abuse, neglect, or imminent danger in the home.

Despite these findings, DFPS abruptly and without explanation escalated the family's risk level to "High Risk – Open." This drastic reclassification was made without any new evidence, factual support, or documented incident that would justify heightened concern.

The timing of this manufactured escalation coincided directly with DFPS's formal transition from investigation to conservatorship proceedings, suggesting that the adjustment was not safety-driven, but was instead a bureaucratic maneuver designed to rationalize prolonged removal and interference with parental rights.

Such arbitrary action contravenes Texas Family Code §§ 261.101–.302, which require that DFPS determinations be based upon credible evidence of abuse or neglect and supported by clear documentation. DFPS policy itself requires risk assessments to be grounded in substantiated facts, not speculative labels imposed for administrative convenience.

Beyond violating Texas statutory requirements, this fabricated escalation deprived Plaintiff of her fundamental liberty interest in family integrity, a right guaranteed by the Fourteenth Amendment to the U.S. Constitution. By intentionally branding a "safe" family as "high risk" without factual cause, DFPS stigmatized Plaintiff and weaponized its internal systems to impede reunification and prolong state custody.

The escalation was also retaliatory in nature. At the time DFPS reclassified the family, Plaintiff had begun to actively challenge irregularities in drug testing, seek accommodations for disabilities, and raise concerns about DFPS's misconduct. The sudden, unsupported shift to "High Risk" status functioned as punishment for Plaintiff's protected activity rather than as a neutral assessment of child safety.

This arbitrary escalation constitutes:

Fabrication of agency records to create justification for conservatorship;

Violation of due process by imposing damaging classifications without evidence or opportunity to contest;

Retaliation for Plaintiff's exercise of constitutionally protected rights, including the right to petition and to seek redress for official misconduct.

By misusing its authority to reclassify the family in the absence of evidence, DFPS acted outside the limits of both state law and constitutional protections, further entrenching the unlawful separation of Plaintiff from her children.

**O. Fifth Amendment Violation and Deceptive Coercion of Statements**:
Throughout the course of DFPS investigations, Plaintiff was repeatedly compelled to provide detailed personal information regarding her medical treatment, prescription medication, mental health, household conditions, and parenting practices.

At no time during these compelled interrogations was Plaintiff advised of her constitutional right to remain silent or her privilege against self-incrimination, as safeguarded by the Fifth Amendment and incorporated against the States by the Fourteenth Amendment.

Rather than conducting interviews in a transparent or lawful manner, Defendant Maeretha Wilburn used deception and coercion to elicit statements. She deliberately presented herself to Plaintiff as a "friend" and assured Plaintiff that any disclosures made during their private conversations would be treated as confidential and would not be used against her.

Relying upon these assurances of confidentiality, Plaintiff shared personal thoughts, feelings, and details related to her circumstances, believing she was engaging in a supportive rather than adversarial dialogue.

Contrary to her assurances, Wilburn then turned around and used these statements — and, in multiple instances, fabricated or distorted false statements Plaintiff never made — as evidence in the removal proceedings. Such conduct effectively tricked Plaintiff into supplying incriminating information under the false pretense of friendship and confidentiality.

This practice violated not only the Fifth Amendment's privilege against self-incrimination, but also well-established DFPS policy and ethical standards that prohibit investigators from

engaging in deceptive practices during interactions with parents, and that require accuracy and good faith in the recording and reporting of statements.

By weaponizing confidential disclosures and fabricating new allegations under the guise of trust, Wilburn deprived Plaintiff of a fair process and acted in a manner that was deliberately retaliatory, malicious, and unconstitutional.

The coerced and fabricated statements were used as substantive evidence to justify emergency removal, to support custody restrictions, and to influence adverse determinations regarding Plaintiff's parental rights—constituting fraud on the court, violation of constitutional protections, and direct contravention of DFPS's policies requiring neutrality, transparency, and accuracy in investigative reporting.

**P. Denial of Emergency Assistance Funds and Refusal of Support Services**
Plaintiff, along with her minor children Parker and Greyson, were formally approved under DFPS guidelines to receive Emergency Assistance (EA) funds intended to maintain family stability, cover rent, utilities, and basic household needs, and support reunification during the CPS process.

Despite this approval, no EA funds were ever disbursed. This deliberate failure directly contradicted DFPS's statutory obligations and written commitments, and it imposed severe instability at a time when Plaintiff and her children most needed support.

In addition to the unfulfilled EA approval, Plaintiff repeatedly submitted requests to DFPS caseworkers for assistance to cover essential bills, rent, food, and other necessities. Each of these requests was either ignored or formally denied without justification.

Plaintiff also specifically requested job training or employment support programs that DFPS is required by law and policy to offer to strengthen parental capacity and promote family independence. Despite qualifying for and repeatedly asking for such services, Plaintiff was denied all vocational support, employment training, or related referrals.

By withholding financial aid, housing stability resources, and job training, DFPS not only violated the spirit and letter of its own programs, but also intentionally sabotaged Plaintiff's reunification efforts, knowing that financial insecurity would make it more difficult for her to comply with DFPS's demands and maintain parental rights.

These actions constitute:

Violation of Tex. Fam. Code §§ 264.107–.108, requiring DFPS to provide designated reunification and family preservation services;

Intentional retaliation and bad faith, punishing Plaintiff for asserting her rights and resisting coerced Safety Plans;

Denial of equal protection and due process under the Fourteenth Amendment by discriminatorily withholding services made available to other similarly situated families.

The denial of approved EA assistance, combined with the refusal to provide any support for rent, bills, or job training, left Plaintiff in an economically destabilized position, directly undermining the very goals of child welfare statutes — which are intended to promote preservation and reunification with family whenever possible. Instead, Defendants weaponized the denial of support to further justify prolonged separation and continued interference.

**Q. Delayed Adversary Hearing Beyond Statutory Deadline and Dismissal Without Prejudice**
Texas Family Code § 262.201 requires that after a child's removal, an adversary hearing must be held within 14 days to review the removal, establish jurisdiction, and determine placement unless extended for extraordinary cause.

Plaintiff's children were removed months before this deadline but DFPS and the Court failed to schedule or hold any adversary hearing within the statutory 14-day window or a reasonable timeframe, resulting in nearly a 90-day delay before Plaintiff was afforded a hearing. This egregious delay prolonged the unconstitutional separation of Plaintiff from Parker and Greyson without meaningful judicial review.

Despite this delay, DFPS proceeded to seek further removal and "safety plans" against Plaintiff, relying on fabricated evidence obtained through flawed procedures.

On June 30, 2025, DFPS enforced court orders that were unsigned and unauthenticated, further violating procedural and substantive due process as established in In re D.W., 498 S.W.3d 100 (Tex. 2016).

### R. Discovery Obstruction and Suppression of Evidence

On July 29, 2025, and in subsequent filings, Plaintiff properly issued and served lawful subpoenas directed to DFPS and its contracted laboratories — including Quest Diagnostics, Omega Laboratories, i3Screen, and Texas Drug & Alcohol Testing Services. These subpoenas lawfully sought production of material records, including but not limited to:

complete drug testing protocols and methodologies,

chain-of-custody records necessary to verify sample integrity, and

internal communications concerning the handling, interpretation, and reporting of Plaintiff's drug test results.

Instead of complying, multiple DFPS personnel, in concert with the Office of Consumer Affairs and contracted laboratory defendants, stonewalled Plaintiff's discovery requests and refused to produce any responsive records. Plaintiff's repeated efforts to secure transparency were met with categorical denials and administrative obstruction.

Moreover, DFPS and its agents denied Plaintiff the right to confront or cross-examine the evidence and witnesses whose reports and statements were relied on in support of the removal proceedings. The concealment of testing protocols, refusal to disclose chain-of-custody, and categorical blockade of cross-examination rights deprived Plaintiff of the fundamental tools of defense and stripped her proceedings of adversarial fairness.

DFPS's and the laboratory defendants' failure to comply with lawful subpoenas and willful suppression of material evidence constituted a direct violation of Plaintiff's constitutional rights

to due process under the Fourteenth Amendment, as well as her statutory rights under federal and state law guaranteeing access to discovery and meaningful challenge of adverse evidence.

By ignoring the subpoenas and concealing exculpatory information, DFPS and its laboratory collaborators obstructed Plaintiff's ability to expose unreliable, inaccurate, and misrepresented drug-testing evidence, thereby undermining the truth-finding function of the proceedings. This deliberate suppression was part of a broader pattern of misconduct designed to insulate DFPS's fabricated narrative from scrutiny and foreclose Plaintiff's meaningful opportunity for defense.

On August 4th, 2025 the case was officially dismissed without prejudice, meaning it was closed without resolution on the merits and without requiring DFPS to carry the burden of proof, leaving Plaintiffs with no remedy or restoration and further compounding due process injuries.

This dismissal, in combination with the delayed hearing and discovery obstruction, deprived Plaintiff and Plaintiffs' children of their constitutional rights to timely hearings, fair process, confrontation of evidence, and meaningful judicial determination under the Fourth and Fourteenth Amendments.

### S. Retaliatory Procedural Maneuvering by State Courts

Remarkably, just days later, on August 11, 2025, an Order of Transfer was issued, shifting the matter from the 250th Judicial District Court to the 126th Judicial District Court, despite the absence of any active pleadings or live controversy remaining before the court. The issuance of a transfer order in the wake of a total dismissal is an extraordinary and procedurally anomalous act, devoid of any neutral administrative or judicial purpose.

This contradictory and duplicative sequence—first extinguishing all pending matters through dismissal, then transferring a vacated case to another court—served no legitimate function

other than to further frustrate and obstruct Plaintiff's pursuit of justice. This pattern of procedural manipulation constituted a deliberate campaign of retaliation against Plaintiff, in clear response to her exercise of constitutional rights, her resistance to coercive demands, and her stated intent to pursue federal relief.

By orchestrating successive dismissals and transfers without merit-based resolution, state officials intentionally:

a. Imposed unnecessary delay and procedural confusion to exhaust Plaintiff's resources and will to litigate;
b. Shielded DFPS misconduct from judicial scrutiny by foreclosing hearings, evidence, and adversarial testing of claims;
c. Discouraged and intimidated Plaintiff from asserting her constitutional rights by forcing her to repeatedly restart legal proceedings in unfamiliar venues;
d. Manufactured a constantly shifting jurisdictional landscape that prevented Plaintiff from establishing stable representation or obtaining consistent judicial oversight.

Collectively, these actions amounted to retaliatory procedural sabotage, calculated to deny Plaintiffs a fair process, meaningful access to the courts, and the opportunity for timely redress of the constitutional violations perpetrated by DFPS. In doing so, state officials amplified and prolonged the harm inflicted, in plain violation of Plaintiffs' rights under the Fourth and Fourteenth Amendments.

**S. Improper Inclusion of Third-Party Confidential Information and Evidence of Broader Fabrication**

In addition to fabricating evidence and suppressing exculpatory medical records related to Plaintiff, DFPS improperly included the personal and confidential information of unrelated parents within Plaintiff's case file.

These entries contained identifying details, personal medical data, and allegations pertaining to other families wholly unrelated to Plaintiff, her children, or the investigation at issue. Such inclusion not only represents a serious breach of confidentiality and privacy rights, but also undermines the integrity of the record as a whole.

Upon further review of one such entry involving a third-party parent, it became evident that the drug test results included in Plaintiff's case file appeared falsified in the same manner as Plaintiff's own laboratory results. The "positive" findings reported against that parent reflected biologically impossible levels, unverified prescription conflicts, and other irregularities identical to the testing errors and manipulations observed in Plaintiff's case.

This cross-contamination of records demonstrates that DFPS and its laboratory partners were engaged not in isolated error, but in a systemic pattern of fabricating and misrepresenting toxicology results across multiple parents and cases.

By carelessly and improperly including third-party information in Plaintiff's file — and by simultaneously relying on drug test data that bore signs of fabrication — DFPS deprived Plaintiff not only of her constitutional rights, but also compounded her harm by revealing a broader culture of falsification reaching beyond her case.

These actions violated:

Plaintiff's Fourteenth Amendment right to due process, by poisoning her record with irrelevant and unreliable third-party material;

HIPAA and confidentiality obligations, by improperly disclosing other parents' identifying information;

Texas Family Code §§ 261.201 and 264.408, which strictly govern confidentiality of child protection records; and

Basic constitutional fairness, by demonstrating that Defendants' practices extended into systematic evidence fabrication, not mere clerical error.

The revelation that other parents' drug results were manipulated in ways similar to Plaintiff's confirms that the Defendants' actions were not random or accidental, but deliberate, widespread, and malicious, carried out in reckless disregard of federal and state law.

**V. CLAIMS FOR RELIEF**

Count 1 – 42 U.S.C. § 1983: Fourteenth Amendment Due Process Violation

Plaintiffs had a clearly established constitutional right to procedural due process before being deprived of their fundamental liberty interest in the care, custody, and companionship. This includes timely notice, a meaningful opportunity to be heard, and adjudication based on reliable evidence.

Defendants violated this right by:

- Removing Parker and Greyson from Plaintiff's custody without adequate notice or fair hearings within the statutorily required 14 days, instead delaying adversary hearings for nearly 90 days;
- Relying on fabricated, unreliable, and scientifically unsound evidence without providing Plaintiffs an opportunity for cross-examination or confrontation;
- Dismissing Plaintiff's challenges without requiring DFPS to bear the burden of proof or lawfully adjudicate allegations, leaving Plaintiffs without a remedy;
- Obstructing Plaintiff's access to evidence through willful noncompliance with lawful subpoenas, denying fair process and judicial oversight.

These acts constitute a flagrant violation of Plaintiffs' Fourteenth Amendment due process rights.

Count 2 – 42 U.S.C. § 1983: Fourth Amendment Unreasonable Search and Seizure

Plaintiff Alisa Golz's Fourth Amendment right to protection against unreasonable searches and seizures was violated when:

- Defendant Chelsea Campos entered and searched Plaintiff's home without a warrant, probable cause, exigency, or proper notice;
- Defendant Maeretha Wilburn ordered Greyson's daycare to unlawfully withhold custody from Plaintiff without any court order or lawful safety plan authorization, constituting an illegal seizure of Greyson.

These actions were undertaken under color of state law without constitutional justification, constituting an unlawful intrusion and seizure.

Count 3 – 42 U.S.C. § 1983: First Amendment Retaliation:
Plaintiff Alisa Golz engaged in protected speech by raising grievances, filing complaints about evidentiary irregularities, and advocating for her parental rights. Defendants retaliated by:

- Imposing punitive visitation restrictions and gag orders restricting Plaintiffs speech with each other;
- Suppressing Parker's independent expressions of desire to live with his mother;
- Restricting family interactions and communications in retaliation for Plaintiff's protected conduct.

Such acts violate the First Amendment's protections against retaliation for exercising free speech and association.

Count 4 – 42 U.S.C. § 1983: Fourteenth Amendment Familial Association Rights:
The liberty interest protected by the Fourteenth Amendment encompasses the rights of parents and children to live together and maintain family bonds, including sibling relationships.

Defendants infringed these rights by:

- Preventing Parker and Greyson from visiting or interacting with one another for over four months without legal basis or procedural safeguards;
- Prohibiting unsupervised visitation and private communication between Parker and his maternal grandmother and mother;
- Withholding Greyson from Ms. Golz pursuant to unlawful daycare directives devoid of court orders or valid safety plans.

These unjustified restraints on familial association inflicted irreparable harm and violated Plaintiffs' constitutional rights.

Count 5 – Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132:
Plaintiff Alisa Golz, as an individual with a recognized disability (ADHD), was entitled to reasonable accommodations during all CPS and DFPS proceedings. Defendants discriminated by: Denying requested accommodations including extended deadlines, written instructions, and neutral observers;

- Retaliating against Plaintiff after asserting ADA rights;
- Disparaging Plaintiff's legally prescribed medication, undermining her parental capacity unjustly.

These acts constitute discrimination in violation of Title II of the ADA.

Count 6 – 42 U.S.C. § 1985(2): Conspiracy to Interfere with Civil Rights:

Defendants, including DFPS staff and contracted laboratories, conspired to;

- Fabricate, alter, and knowingly submit false evidence;
- Suppress exculpatory evidence and obstruct discovery;
- Interfere with Plaintiffs' constitutional and legal rights to family integrity.

This conspiracy subjected Plaintiffs to deprivation of rights in violation of 42 U.S.C. § 1985(2).

Count 7 – Monell Liability:

DFPS is liable for constitutional violations resulting from municipal policies, customs, and practices, including but not limited to;

- Reliance on fabricated drug test results to justify removals;
- Systematic use of coerced Safety Plans as de facto orders;
- Failure to provide ADA accommodations;
- Deliberate evasion of subpoenas and failure to provide hearings timely.

Such conduct is attributable to DFPS under Monell and is actionable.

Count 8 – State Law Claims:

Defendants' false reports and affidavits defamed Plaintiff and her children, placing them in false light, and caused severe emotional distress. Defendants acted negligently and with gross negligence in evidence handling and procedural compliance, resulting in harm.

Count 9 – 42 U.S.C. § 1983: Fifth Amendment Self-Incrimination Violation:

Plaintiff Alisa Golz was subjected to compelled custodial interrogation without advisement of rights to remain silent or to counsel. Statements were obtained coercively and used against her without the constitutional protections required by Miranda v. Arizona, infringing her Fifth Amendment rights incorporated by the Fourteenth Amendment.

## VI. PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully request that this Court enter judgment in their favor and issue the following relief:

1. A declaratory judgment declaring that Defendants' acts and omissions violated Plaintiffs' rights under the Fourth, Fifth, First, and Fourteenth Amendments to the United States Constitution; Title II of the Americans with Disabilities Act; 42 U.S.C. §§ 1983 and 1985; and applicable Texas state law.

2. An order directing Defendants to expunge and permanently remove all falsified, fabricated, or misleading evidence—including drug test results and affidavits—relied upon in the investigation, removal proceedings, and custody decisions regarding Plaintiffs.

3. Award compensatory damages to Plaintiffs in an amount not less than five million dollars ($5,000,000) for the substantial emotional distress, loss of familial association, deprivation of parental care, and other harms suffered as a direct and proximate result of Defendants' unlawful actions.

4. Award punitive damages against individual Defendants, including but not limited to Maeretha Wilburn, Bridget O'Shaughnessy, Jamie Walker and Chelsea Campos, in an amount sufficient to punish and deter future willful misconduct and malicious violations of civil rights.

5. Award Plaintiffs' reasonable attorneys' fees, costs of litigation, and all other expenses recoverable under 42 U.S.C. § 1988 and other applicable fee-shifting statutes.

6.  Issue injunctive relief compelling Defendants to establish a distinct, dedicated Parental Rights Division within the Texas Department of Family and Protective Services, with a clear mandate and sufficient resources to:

A.  Protect and safeguard parental rights consistent with constitutional and statutory mandates;
B.  Oversee and monitor all parental removal, reunification, and custody proceedings to prevent future abuses;
C.  Ensure prompt, transparent, and meaningful engagement with parents and families;
D.  Implement robust safeguards and training to prevent evidence fabrication, coercion, discrimination, and improper procedural practices.

7.  Appoint Plaintiff Alisa Golz as the inaugural Director of the Parental Rights Division or an equivalent senior supervisory role, recognizing her lived experience, her demonstrated leadership in advocating for systemic reform, and her deep commitment to defending the rights of parents and children across Texas. Such appointment would uniquely empower systemic transformation rooted in the insight of those directly affected.

8.  Grant such other and further relief as this Court deems just, equitable, and proper to fully remedy Defendants' violations and ensure the safeguarding of Plaintiffs' constitutional and statutory rights.

## VII. JURY DEMAND

Plaintiffs demand trial by jury on all issues so triable.

Respectfully submitted,

/s/ _____

Alisa Golz in propria persona sui juris without prejudice

Plaintiff, and Next Friend of minor Plaintiffs

Parker Golz and Greyson McCallum

303B Fantail Loop, Lakeway, TX 78734

512-679-6541 | alisagolz62@gmail.com

Date: August 18, 2025

### Plaintiff's Closing Statement of Purpose

Plaintiff brings this action not only to seek justice for the profound pain, suffering, and irreparable harm inflicted upon her and her children, but also on behalf of the countless other families across Texas and the United States who are subjected every day to the same kind of fabrication, retaliation, and abuse of power by state child welfare authorities.

The plaintiff's family has endured trauma no parent and child should ever have to bear — the unlawful seizure of children, the suppression of truth, the distortion of facts, and the calculated use of coercion to alienate these children not just from their mother, but from each other as well as their extended family. Yet the harm did not stop with just them. This lawsuit arises because Plaintiff knows that unless challenged, these unlawful practices will continue against others who may not have the means, knowledge, or strength to fight back.

Plaintiff refuses to remain silent while this cycle of systemic misconduct and constitutional violations persists. This Complaint is offered not only as a plea for redress of her own grievances, but as a necessary stand to ensure accountability, transparency, and justice for every other parent and child whose voices have been silenced or ignored.

Plaintiff files this suit because she cannot and will not accept a system that tears families apart through falsehoods and coercion. This lawsuit is her promise to her children and to all families across this state: that she will do everything in her power to stop these abuses, to bring the truth into the light, and to restore the constitutional protections that every parent and child deserves.

**"Here I am Lord.... Send me." -Isaiah 6:8**

**DECLARATION OF ALISA GOLZ**
**IN SUPPORT OF FEDERAL COMPLAINT**

I, Alisa Golz, am over eighteen years of age and competent to make this declaration. I make this Declaration in support of my federal civil rights complaint against the Texas Department of Family and Protective Services (DFPS), its employees, and associated laboratories.

I declare under penalty of perjury that the following statements are true and correct to the best of my knowledge, information, and belief:

I am the biological mother of Parker Golz (born September 8, 2013) and Greyson McCallum (born November 6, 2024). I am a resident of Travis County, Texas.

On November 6, 2024, I gave birth to my youngest child, Greyson, at a hospital in Travis County. During labor and delivery, I received fentanyl administered by authorized medical personnel due to a medical emergency.

Neither I nor my newborn exhibited any signs of neonatal abstinence syndrome (NAS) or drug withdrawal throughout our hospital stay. Hospital staff noted Greyson as healthy, with normal Apgar scores.

On November 8, 2024, while I was still recovering from childbirth and preeclampsia, I was approached in the hospital by DFPS investigator Karen Golden. She falsely told me that Greyson's meconium test was completed and "confirmed methamphetamine and fentanyl." DFPS later admitted the test was not yet complete at that time.

I felt pressured and vulnerable. I signed a DFPS "Safety Plan" after being told it was the only way to safeguard my child and close the investigation. I would not have signed had I been given accurate, truthful information.

On November 11, 2024, DFPS investigator Chelsea Campos entered my home without a warrant or court order, conducted an invasive search, photographed private areas, and summoned

uniformed police officers to threaten removal of my newborn and older child. I was again forced under duress to sign a Safety Plan or risk losing custody of my children.

During the entire investigation and custody proceedings, DFPS relied on drug test evidence that I believe is fabricated, inconsistent, and scientifically unreliable. For example:

My specimen ID was assigned to both myself and another individual;

Two different Medical Review Officers appeared on the same specimen;

My prescription for Desoxyn was never verified despite positive results;

Hair tests, oral fluid and urine results were pharmacologically implausible and internally inconsistent;

Specimens were routed between labs and reported in a manner that raises questions of backdating and chain-of-custody tampering.

At all times, I informed DFPS that I was subject to weekly drug testing in connection with a separate, unrelated pretrial monitoring program, and those tests were negative throughout my pregnancy.

On multiple occasions, DFPS employees made false accusations about my history, including telling a DFPS-contracted psychologist that I had "used multiple illegal substances before age 16" and that I "used methamphetamine every day while pregnant." These statements are absolutely false.

DFPS repeatedly denied or ignored my requests for financial assistance, emergency housing, basic living expense support, and job training services—even when I was formally approved for such aid. This denial imposed great hardship and contributed to my inability to promptly reunify with my children despite eligibility.

Throughout this ordeal, DFPS denied my children the right to regular sibling visitation, denied me access to kinship placement for my son, and prohibited unsupervised contact and communication with Parker, even as no court found me unfit and no documentation of risk was ever presented.

I declare that all events and facts described in my federal complaint (attached hereto or filed herewith) are true and correct to the best of my knowledge.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: ___08/20/25___

At: Austin, Texas

Signature:

/s/ _____

Alisa Golz, in propria persona sui juris without prejudice

**Mail body:**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

Case No.: _1:25-cv-01316_

SUMMONS IN A CIVIL ACTION
Plaintiff:
Alisa Golz, Individually and as Next Friend of her minor children, Parker Golz and Greyson McCallum
303B Fantail Loop
Lakeway, TX 78734

Defendant
Jamie Walker
4900 N. Lamar Blvd.
Austin, TX 78751

YOU ARE HEREBY SUMMONED and required to serve upon the Plaintiff an answer to the Complaint which is herewith served upon you, within 21 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

Issued this _____ day of _____, 2025.

Clerk of Court: _____
Deputy Clerk: _____